IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **PROFESSIONAL UNDERWRITERS** | : | |
| **LIABILITY INSURANCE COMPANY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| vs. | : | 5:04CV385 (DF) |
| | : | |
| **GEORGE R. VITO, D.P.M., FOOT and** | : | |
| **LEG CENTERS OF GEORGIA, P.C.,** | : | |
| **and GURJIT DHILLON,** | : | |
| | : | |
| **Defendants.** | : | |

**O R D E R**

Gurjit Dhillon filed a medical malpractice action against Dr. George Vito, Foot and Leg Centers of Georgia, P.C., Surgical Centers of Georgia, P.C., and Middle Georgia Hospital, LLC because of an unsuccessful leg-lengthening operation performed on Dhillon by Vito. This is a declaratory judgment action to determine if Professional Underwriters Liability Insurance Company ("PULIC") must defend or indemnify Defendants in Dhillon's action. Currently before the Court is Plaintiff's Motion for Summary Judgment (tab 22).

**I.   STANDARD OF REVIEW**

The Supreme Court has observed, "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and

we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Under Rule 56, summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp.*, 477 U.S. at 322. In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the non-moving party, but the court may not make credibility determinations or weigh the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.   FACTUAL BACKGROUND

Dhillon underwent a cosmetic leg-lengthening operation on September 27, 2001, that was performed by Vito. Dr. Vito is a licensed podiatrist. Cosmetic leg-lengthening is a surgical procedure in which a patient's lower leg bones are broken and an external fixation device is attached to the separate bone segments by pins that are placed in the leg. The broken segments of bone are slowly separated over time thereby adding length to the bone and thus the patient's height. At the time of the September 2001 operation, Vito and Dhillon anticipated that Dhillon would return to Vito's office for follow-up care. Vito has privileges and practices at Defendant Foot and Leg Centers of Georgia ("FLC")[1]. A second

---

[1] Dr. Vito also has an equity ownership interest in Foot and Leg Centers of Georgia, P.C.

and third surgical procedure was performed on Dhillon in August 2002 and November 2002, respectively. After the third surgery, Dhillon was unhappy with his progress, sought other medical treatment, and filed suit against Vito, FLC, and others in September 2003. Dhillon's complaint, filed in Cobb County, Georgia State Court, alleged six counts. Count one alleged that Vito was negligent per se. The Cobb County State Court granted summary judgment on the neligence per se count to Dhillon, finding that the performance of a leg-lengthening procedure was outside the scope of the Georgia Podiatry Practice Act. This decision was upheld by the Georgia Court of Appeals in September 2004 and the Georgia Supreme Court denied certiorari in February 2005. Thereafter, Plaintiff filed this action to determine its responsibilities and liabilities under the Medical Professional Insurance Policy ("the Policy") it issued to Vito and FLC.

PULIC issued the Policy to Vito and also named FLC as an insured under the Policy. The Policy was a "claims made policy," meaning that it provides coverage for claims, against the named insureds, "arising out of incidents that occurred on or after the retroactive date shown" on the policy. Tab 28, Ex. 2, Pg. 14. The Policy began on July 1, 2001 and lasted until July 1, 2002, however, Vito extended the Policy to provide coverage through July 1, 2003. Contained within the Policy is a Podiatry Endorsement that states

> [i]t is hereby understood and agreed that Claims or Suits which arise from the rendering of or failure to render Professional Services which are outside the scope of the Named Insured's license to practice podiatry, are excluded from coverage.

Tab 28, Ex. 2, Pg. 10.

### III. DISCUSSION

#### A. *Underlying Litigation*

The underlying medical malpractice action brought by Dhillon alleged six counts:

1. Negligence per se
2. Unlawful practice of medicine
3. Fraud & misrepresentation
4. Professional malpractice
5. Respondeat superior – FLC
6. Negligent grant of staff privileges – Middle Georgia Hospital ("MGH")[2]

Dhillon, Vito and FLC concede that PULIC does not owe a duty to defend or indemnify Vito and FLC as to claims for punitive damages, criminal acts, and fraudulent activities. *See* Tab 30, Vito's Resp. Pg. 8; *see also* Tab 28 Dhillon's Resp. Pg. 2. Dhillon also concedes that PULIC does not owe a duty to defend or indemnify for the initial, illegal leg-lengthening surgery. Consequently, Vito and FLC admit there is no coverage for counts two and three of Dhillon's underlying action and Dhillon admits that coverage does not exist for counts one, two, and three.

PULIC and Dhillon agree that the controlling question in this litigation is whether there are claims that do not arise from the leg-lengthening procedure that PULIC has a duty to defend or indemnify. On the other hand, Defendants Vito and FLC argue that

---

[2] Middle Georgia Hospital is not a party to this declaratory judgment action as it is not a named insured under the Policy.

4

PULIC has a duty to defend or indemnify the action brought by Dhillon because PULIC had notice that Vito was performing leg-lengthening operations prior to the issuance of the Policy and still chose to issue the Policy.

### B.     *Coverage Under the Policy*

To determine coverage under the Policy, the Court looks to "the allegations of the complaint to determine whether a claim covered by the policy is asserted" because the duty to defend turns "on the language of the insurance contract and the allegations of the complaint asserted against the insured." ***Nationwide Mut. Fire Ins. Co. v. Somers***, 591 S.E.2d 430, 433 (Ga. Ct. App. 2003)[3]. From a review of the complaint, the insurer has a duty to defend "[i]f the facts as alleged in the complaint even arguably bring the occurrence within the policy's coverage." *Id.* But the duty to defend is not without exceptions; the insurer is justified in refusing to defend a lawsuit where the complaint filed against the insured does not assert any claims upon which there would be insurance coverage. *See* ***Great Am. Ins. Co. v. McKemie***, 259 S.E.2d 39 (Ga. 1979). The duty to indemnify is a separate obligation that is determined by the terms of the insurance contract itself. *See* ***City of Atlanta v. St. Paul Fire & Marine Ins. Co.***, 498 S.E.2d 782, 785 (Ga. Ct. App. 1998). After

---

[3] The Court applies Georgia law because the insurance contract was made in Georgia, and thus, Georgia law governs the interpretation of the contract. *See* ***Fed. Ins. Co. v. Nat'l Distrib. Co., Inc.***, 417 S.E.2d 671, 675 (Ga. Ct. App. 1992)(stating that contract is made in state where delivered); *see also* ***Fernandez v. Bankers Nat. Life Ins. Co.***, 906 F.2d 559, 564 (11th Cir. 1990) (stating that state law governs interpretation of an insurance contract).

determining coverage, the duty to indemnify is decided but the Court is not confined to the facts contained within the pleadings to make this determination. *See id.* at 785.

In this matter, coverage under the Policy depends upon the applicability of the podiatry endorsement and the relationship between the leg-lengthening procedure and the claims alleged in Dhillon's medical malpractice action. Dhillon alleges that there are claims that do not arise from the initial, illegal leg-lengthening procedure, in response to PULIC's position that it has no duty to defend or indemnify because the claims all arise from the leg-lengthening procedure. No party disputes the validity of the podiatry endorsement. However, Vito and FLC assert that PULIC's prior knowledge of Vito's leg-lengthening procedures precludes PULIC from denying coverage based on the podiatry endorsement.

    1.    *Podiatry Endorsement*

Vito and FLC admit that the podiatry endorsement is clear, unambiguous, and thus valid. *See* Tab 30, Defs.' Resp. Pg. 5. But, Vito and FLC assert that the podiatry endorsement cannot be enforced because PULIC had knowledge that Vito was performing acts outside the scope of podiatry at the time the Policy was entered into. As evidence of this notice, Vito and FLC point to printed pages from the website of FLC and Dr. Vito that were contained within PULIC's underwriting file. In presenting their argument Vito and FLC do not cite a single case or legal authority, and the Court can find none that supports their position.

An insurer has the right to exclude from its policy coverage any risk that it is not willing to cover. *See Matjoulis v. Integon Gen. Ins. Corp.*, 486 S.E.2d 684, 685 (Ga. Ct. App. 1997) (stating that "an insurer may insure against certain risks and exclude others"). In this instance, PULIC chose to exclude any aspect of Vito's practice that was not within the legal parameters of a podiatrist's practice. *See* Tab 26, Ex. 2, Pg. 10. PULIC has not waived its right to apply the podiatry endorsement nor is it estopped from applying the endorsement because of prior notice of leg-lengthening procedures. *See Matia v. Carpet Transport, Inc.*, 888 F.2d 118, 121 (11th Cir. 1989) (citing **St. Paul Fire & Marine Insurance Co. v. Cohen-Walker, Inc.**, 320 S.E.2d 385 (Ga. Ct. App. 1984)) ("When an insurance policy specifically excludes coverage for certain risks, estoppel and waiver by the insurer do not expand the policy to cover these risks."). Indeed, the fact that PULIC may have had notice of Vito's leg-lengthening procedures prior to issuing the Policy weighs in favor of enforcing the podiatry endorsement – that is, PULIC knew of the procedures and specifically chose to exclude these procedures as a risk they were willing to cover.[4] The conduct of PULIC cannot be used to expand the coverage of the Policy; the issuance of the Policy, even assuming it was issued with notice, does not force PULIC to insure a risk that it specifically excluded from coverage. *See **Parris & Son, Inc. v. Campbell***, 196 S.E.2d 334

---

[4] PULIC denies having knowledge of Vito's leg-lengthening procedures. The Court does not find or engage in the effort to find whether PULIC had knowledge. Rather, the Court assumed that there was the potential for PULIC to have had notice and considered that possibility.

(Ga. Ct. App. 1973) (determining that conduct or action of insurer could not force coverage for risk that was excluded). Rather, the Policy is to be enforced as it was written, giving full effect to the podiatry endorsement. *See **Pilz v. Monticello Ins. Co.***, 599 S.E.2d 220, 222 (Ga. Ct. App. 2004) (applying exclusion of coverage when unambiguous, even when beneficial to insurer and detrimental to insured).

      2.    *Arising From*

Dhillon agrees with PULIC that the determinative issue in this matter is whether all of the allegations contained within his complaint arise from or out of the initial, illegal leg-lengthening surgery. The Georgia Supreme Court "has interpreted an event 'arising out of' a person's action to constitute an event that would not have occurred but for the person's action." ***Carver v. Empire Fire & Marine Ins. Co.***, 605 S.E.2d 842, 845 (Ga. Ct. App. 2004) (citing ***Continental Cas. Co. v. HSI Financial Svcs.***, 466 S.E.2d 4 (Ga. 1996). In other decisions, Georgia courts have reasoned that when a coverage exclusion focuses on the origin of the claims, coverage under the insurance policy is determined by but for causation. For example, in ***Jefferson Ins. Co. of N.Y. v. Dunn***, the Georgia Supreme Court denied coverage for claims of negligent hiring, negligent supervision, and malicious prosecution because but for the underlying assault and battery, which was barred by a coverage exclusion, there would have been no claims against the employer. 496 S.E.2d 696 (Ga. 1998).

Georgia law has also clarified that "[a]rising from" does not mean the same thing as "proximately caused by." *Interface Group-Nevada, Inc. v. Freeman Decorating Co.*, 473 S.E.2d 573, 575 (Ga. Ct. App. 1996). Rather, the term arising from requires a case by case analysis of the individual facts to determine whether the injury in question "had its origin," "grew out of," "flowed from," or "originated" from the underlying cause. *Southeastern Fidelity Ins. Co. v. J.G. Stevens*, 236 S.E.2d 550, 551 (Ga. Ct. App. 1977). The term arising from includes "almost any causal connection or relationship" such that a party does not have to be the proximate cause of an injury to be held responsible for the injury. *Interface*, 473 S.E.2d at 575.[5]

Dhillon came to Vito's office in Macon, Georgia from London, England, after he learned about Vito's leg-lengthening operations, and presented to Vito for the sole purpose of undergoing this procedure. After Vito conducted an initial examination of Dhillon and the decision was made to conduct the procedure, Vito obtained the necessary credentialing from MGH and the procedure took place on September 27, 2001. Subsequently, Dhillon

---

[5] Dhillon attempts to rebut PULIC'S motion by pointing out that in both *Interface* and *Stevens* the Georgia Court of Appeals found that there were questions of fact remaining for the jury. But, this case presents a different question than that presented in *Interface* and *Stevens*. In those cases, parties were seeking to avoid liability for an injury by alleging that their involvement with the underlying accident was too far removed from the injury for the injury to have arisen from their involvement. But, it was determined that the broad definition of arising from might include their involvement and prevented a finding of no liability. To the contrary, PULIC points to the broad meaning of arising from as the reason it has no duty to defend or indemnify. The Policy excludes coverage for acts arising from the underlying leg-lengthening surgery, and PULIC argues that the broad definition of arising from encompasses the other allegations of malpractice at issue in this action.

returned for two additional surgeries that, according to Vito were made necessary because of the initial leg-lengthening procedure. *See* Tab 29, Vito Depo. Pg. 21, 26. The second and third surgeries arose from, occurred because of, were caused by the leg-lengthening operation.

Dhillon points to the hospital surgical credentialing, the failure to obtain proper psychiatric evaluations, failing to correct angulation, and the performance of unnecessary surgery as specific acts that did not arise out of the initial leg-lengthening procedure. *See* Tab 28, Dhillon's Resp. Ex. A. ¶ 12. These four acts correspond to count four, professional malpractice, count five, respondeat superior – FLC, and count six, negligent credentialing – MGH.[6]

Given the definition Georgia law attaches to "arising from," there can be little doubt that the negligent credentialing claim brought by Dhillon arises from the leg-lengthening procedure. The need to be credentialed to perform the leg-lengthening procedure had its origin in Dhillon's decision to undergo the surgery. Whatever negligence MGH may be liable for in credentialing Vito to perform a leg-lengthening operation on Dhillon is directly related to the performance of the operation itself. But for Dhillon's decision to attempt to have his legs surgically lengthened, there would have been no need for Vito to be

---

[6] Count six is implicated even though MGH is not a party to this action because Vito was on the credentialing committee at MGH and the Policy provides coverage for Vito's actions as a member of such a committee.

credentialed to perform a leg-lengthening procedure. Consequently, the direct relationship between the negligent credentialing claims and the initial leg-lengthening procedure forecloses coverage under the Policy. Thus, there is no coverage for count six.

Dhillon argues that there is coverage for other acts of professional malpractice committed by Vito, as alleged in count four, and supports this argument with an affidavit provided by Dr. Dror Paley, a medical doctor practicing in orthopaedic surgery who has treated Dhillon post-leg-lengthening procedure. Specifically, Dhillon alleges professional malpractice in that Vito failed to meet the acceptable standards of care, according to Paley, by: (1) not utilizing appropriate fixation for the fibula thus resulting in malunion or nonunion; (2) failing to treat developing equinous bilaterally; (3) failing to correct angulation; (4) prematurely removing frames before bone healed or consolidated properly; (5) performing additional, unnecessary surgeries; (6) failing to address nerve injury; and (7) failing to conduct proper psychological evaluations on prospective patients. *See* Tab 28, Dhillon's Resp. Ex. A. ¶ 8. Paley bases his conclusions and opinions on his education and training, treatment of Dhillon, and a review of his medical records.

In presenting the affidavit of Paley that alleges malpractice, Dhillon must show "specific supporting facts" for the affidavit to have probative value in rebutting PULIC's motion for summary judgment. **Leigh v. Warner Bros., Inc.**, 212 F.3d 1210, 1217 (11th Cir. 2000). The Eleventh Circuit has made clear that "conclusory allegations" are not sufficient

11

to oppose a motion for summary judgment. *Id.* (citing *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985)).  Paley's affidavit consists of fifteen numbered paragraphs and is ten pages in length.  The first five paragraphs of the affidavit are a summation of the affiant's credentials and the procedures and treatment undergone by Dhillon, both by Vito and Paley.  Then, in paragraph eight, Paley, offers his opinion setting forth seven allegations of professional malpractice by Vito.  There are no specific facts or data offered in paragraph eight to support the allegations of malpractice, rather the preceding background information is the basis for Paley's opinions.  In particular paragraph six provides the only specific information regarding Dhillon's condition – that he suffered from complete foot drop on the right side, fixed flexion deformity of both knees, knock-kneed deformity on his right knee, and that his right leg was 1.4 centimeters longer than his left leg.  The paragraph also states that there will be permanent loss of function.  There are no further details provided, or any information that clarifies how each injury is attributed to specific acts of negligence.  The conclusory statement that  will suffer a loss of function is not supported by detail or description.

The affidavit Dhillon offers is devoid of merit because "'the absence of any specific facts which would substantiate [the doctor's] conclusion deprives this medical diagnosis of any probative value.'"  *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1223 (11th Cir. 2000) (quoting *Hilburn v. Murata Electronics North Amer., Inc.*, 181 F.3d 1220, 1227-28 (11th Cir.

1999)). In *Hilburn*, the Eleventh Circuit reasoned that a conclusory statement that a patient had suffered a heart attack and suffered from heart disease was not sufficient to support the conclusion that the patient was unable to run and had a substantially limited ability. 181 F.3d at 1227-28.  Likewise, Paley's affidavit states that Dhillon has and will suffer a loss of leg function but falls short of alleging facts sufficiently specific to support the conclusion that professional malpractice unrelated to the leg-lengthening procedure is to blame for Dhillon's loss of leg function.

Furthermore, the Court is strained to see how the allegations of malpractice made by Dhillon do not arise out of the leg-lengthening procedure.  But for the initial operation there would have been no additional treatment – the subsequent actions may have been negligent but they were necessitated by the initial leg-lengthening operation, which has already been found negligent per se.  The subsequent acts of removing leg frames, of performing follow-up surgeries, of not using appropriate fixation, of not treating equinous or correcting angulation, and of not addressing nerve injury would never have occurred absent the initial procedure.  It is especially telling that Vito testified that the treatment he provided Dhillon subsequent to the initial procedure was made necessary and arose out of the leg-lengthening procedure.  *See* Tab 29, Vito Depo. Pg. 21, 26.  In addition, the claim for failing to conduct a proper psychological evaluation prior to surgery stems from the negligent conduct surrounding the leg-lengthening procedure.  This procedure was

negligently performed, and the failure to perform a proper psychological evaluation as a part of the preparation for the procedure is just one way in which the procedure was negligently performed.

Consequently, Dhillon has failed to show that there are claims that did not arise from the initial leg-lengthening procedure. There is insufficient evidence in Paley's affidavit and the Court is unable to understand how any of the alleged acts do not arise from the leg-lengthening procedure Dhillon underwent in August 2002. Therefore, no coverage exists under the Policy for the claims alleged by Dhillon.

### 3. *Timely Notice*

An independent reason that no coverage exists under the Policy is because Vito and FLC failed to give PULIC notice of Dhillon's action within the period prescribed by the Policy. Notice is critical to the insurer because timely notice allows the insurer to properly inform itself, to investigate, to prepare a defense, and be advised of whether settlement would be prudent. See ***Southeastern Express Sys., Inc. v. So. Guar. Ins. Co.*** 482 S.E.2d 433, 436 (Ga. Ct. App. 1997) (citing ***Public Nat'l Ins. Co. v. Wheat***, 112 S.E.2d 194 (Ga. Ct. App. 1959)). Consequently, "timely notice is considered a condition precedent of the insurer's duty to defend or pay." ***Clarke v. Unum Life Ins. Co. of Amer.***, 14 F. Supp. 2d 1351, 1354 (S.D. Ga. 1998) (internal citations omitted).

The Policy required Vito and FLC to "immediately" notify PULIC of all details regarding any situation, whether groundless or not, that might give rise to a medical professional liability action. *See* Tab 22, Vito's Resp. Ex. 2 Pg. 15. Vito was served with the Dhillon action on September 15, 2003 and FLC received service on September 18, 2003. The parties filed a joint answer on October 15, 2003. PULIC was notified of the Dhillon action on June 14, 2004.

To determine whether timely notice was given, the actions of the insured, Vito and FLC, are considered against the actions of "an ordinarily prudent person acting reasonably." **Guar. Nat'l Ins. Co. v. Brock**, 474 S.E.2d 46, 48 (Ga. Ct. App. 1996). Nine months lapsed between Vito and FLC receiving service of the Dhillon action and PULIC receiving notice of the action. The law does not require the insured to give notice of every instance or occurrence, rather what is required is that Vito and FLC notify PULIC of those claims that an ordinarily prudent person acting reasonably would foresee. *Id.* at 48. In this instance no foresight was required. Vito and FLC received service of process in September 2003 and waited nearly a year before notifying PULIC of an actual, existing malpractice action. An ordinarily prudent person acting reasonably would not have waited this length of time before notifying their insurer. Thus, were coverage not already foreclosed by Policy exclusions, coverage would be barred by Vito and FLC's failure to give timely notice.

C.  **Duty to Indemnify**

By definition, "the insurance policy is an indemnity agreement that if there is coverage then such policy will indemnify the insured against the liability claims of the plaintiff-claimant and be an asset available to satisfy any judgment against the insured." *Vara v. Essex Ins. Co.*, 604 S.E.2d 260, 262 (Ga. Ct. App. 2004).  In this action, the Court has determined that there is no coverage under the Policy.  Consequently, the absence of coverage forecloses any obligation of indemnity under the Policy.

IV. **CONCLUSION**

There is no coverage under the Policy.  Additionally, PULIC has no duty to indemnify any Defendant for claims not covered under the Policy.  Plaintiff's Motion for Summary Judgment is **GRANTED**.

SO ORDERED, this 11th day of July, 2005.

s/ Duross Fitzpatrick
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/has